**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 19-1237**

MILIYON A. ETHIOPIS,

Petitioner,

v.

WILLIAM P. BARR, Attorney General,

Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals.

Argued: September 10, 2020                          Decided: October 14, 2020

Before DIAZ, THACKER, and HARRIS, Circuit Judges.

Petition for review denied by unpublished per curiam opinion.

**ARGUED:** David Carlos Baluarte, WASHINGTON & LEE UNIVERSITY SCHOOL OF LAW, Lexington, Virginia, for Petitioner. Joseph D. Hardy, Jr., UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Joseph H. Hunt, Assistant Attorney General, Anthony C. Payne, Assistant Director, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Miliyon Ethiopis ("Petitioner"), a native of Ethiopia, petitions for review of an order of the Board of Immigration Appeals ("BIA") denying his second motion to reopen his removal proceedings as untimely and number-barred.[1] In his second motion to reopen, Petitioner argues that the Ethiopian government discriminatorily denationalized him by refusing to issue him a passport in 2011, and that his denationalization constitutes changed country conditions that allow him to file his second motion despite its non-compliance with the time and number restrictions set out in 8 C.F.R. § 1003.2(c)(2). Because Petitioner could have raised this exact argument when he filed his first motion to reopen in December 2011 -- six and a half years before he filed his second motion -- we deny the petition for review.

I.

Petitioner was born in Ethiopia in 1973 to a father of Eritrean ethnicity[2] and a mother of Oromo ethnicity.[3] His family owned several businesses in Ethiopia, including a successful dry cleaning business. After a border war erupted between Ethiopia and Eritrea in 1998, the Ethiopian government arrested and deported Petitioner's father and confiscated the family's businesses, money, and property. For the next three years,

---

[1] A second motion to reopen is number-barred pursuant to 8 C.F.R. §1003.2(c)(2) because that section allows a party to "file only one motion to reopen deportation or exclusion proceedings."

[2] Eritrea is an African country that shares Ethiopia's northern border.

[3] The Oromo are the largest ethnic group in Ethiopia.

Petitioner frequently questioned the Ethiopian government about his father's deportation and the seizure of his family's assets, which eventually led to the Ethiopian government arresting Petitioner and detaining him for three months. Petitioner recounts that during the time he was detained, he was beaten, subjected to harsh interrogations, harassed because of his Eritrean heritage, and accused of collaborating with the Eritrean government. Once released, Petitioner decided to "leave Ethiopia for good," but the Ethiopian government confiscated his passport and refused to issue him an exit visa. A.R. 48.[4] As a result, he was unable to leave the country legally. Undeterred, Petitioner claims that he used a fake passport to board a flight out of Ethiopia and arrived in the United States on July 22, 2001.

Petitioner's lengthy immigration proceedings began less than a year after his arrival in the United States when he requested asylum, withholding of removal, and protection under the Convention Against Torture. On June 18, 2003, the Immigration Judge ("IJ") who heard his claims for relief denied all three, finding Petitioner's application to be untimely and his claims not credible. Specifically, the IJ noted that Petitioner's "testimony about his arrival [was] not convincing at all and [was] very improbable," A.R. 724, and believed that Petitioner may have exaggerated the severity of the harm he suffered in Ethiopia. The BIA affirmed the IJ's decision in 2004. Petitioner petitioned for review of the BIA's decision but did not file a brief or otherwise pursue the claim, resulting in dismissal of the petition for failure to prosecute pursuant to this court's Local Rule 45. *See*

_____

[4] Citations to the "A.R." refer to the Administrative Record filed by the parties in this case.

*Ethiopis v. Gonzales*, No. 04-2564 (4th Cir. 2005); 4th Cir. R. 45 (dismissals for failure to prosecute).

In September 2011, Petitioner, who had remained in the United States despite the issuance of a removal order, applied for a new Ethiopian passport, but the officials at the Ethiopian embassy in Washington, D.C. refused to issue him one. After learning of his Eritrean heritage, an embassy official informed Petitioner over the phone that he was "not considered an Ethiopian and not eligible for an Ethiopian passport." A.R. 229. Petitioner then went to the Ethiopian embassy in person, where the officials reiterated that he was "now considered an Eritrean" and accordingly was "not eligible for an Ethiopian passport." *Id.*

Petitioner filed his first motion to reopen his immigration proceedings on December 5, 2011 ("First Motion"). In this First Motion, he argued that the Ethiopian government discriminatorily denationalized him by refusing to issue him a passport because of his Eritrean ethnicity. Petitioner requested that the BIA exercise its sua sponte authority to reopen his removal proceedings. The BIA denied the First Motion, which this court concluded was not an abuse of discretion. *See Ethiopis v. Holder*, 509 F. App'x 252 (4th Cir. 2013). Petitioner also moved for the BIA to reconsider its denial of the First Motion, but the BIA denied that motion as well.

On May 20, 2018, Petitioner filed a second motion to reopen ("Second Motion"). This is the motion we consider in the present petition. As he did in the First Motion, Petitioner claims in his Second Motion that he was discriminatorily denationalized as a result of the 2011 incident at the Ethiopian embassy. Petitioner also argues that his

4

denationalization constitutes changed circumstances in Ethiopia that allow him to file the Second Motion, which otherwise would be untimely and number-barred pursuant to 8 C.F.R. § 1003.2(c)(2). Additionally, Petitioner asserts that he was formally recognized as stateless by the United Nations High Commissioner for Refugees on October 6, 2017.[5] On February 8, 2019, the BIA rejected Petitioner's changed circumstances argument and denied the Second Motion as untimely and number-barred. Petitioner then filed the present petition for review of the BIA's denial of the Second Motion.

## II.

A non-citizen "may file only one motion to reopen" his immigration proceedings, and "that motion must be filed no later than 90 days after the date on which the final administrative decision was rendered in the proceeding sought to be reopened." 8 C.F.R. § 1003.2(c)(2). However, these time and number restrictions do not apply to a motion to reopen that is "based on changed circumstances arising in the country of nationality or in the country to which deportation has been ordered, if such evidence is material and was not available and could not have been discovered or presented at the previous hearing." *Id.* § 1003.2(c)(3)(ii); *see also Lin v. Holder*, 771 F.3d 177, 182 (4th Cir. 2014) (explaining the motion to reopen filing rules set out by 8 C.F.R. § 1003.2(c)).

---

[5] In 2006, the General Assembly of the United Nations empowered the High Commissioner for Refugees to formally identify stateless persons. *See* United Nations High Commissioner for Refugees, *Handbook on Protection of Stateless Persons* 4 (2014), https://www.unhcr.org/dach/wpcontent/uploads/sites/27/2017/04/CH-UNHCR_Handbook-on-Protection-of-Stateless-Persons.pdf (saved as ECF Opinion Attachment).

"We review the BIA's denial of a motion to reopen for abuse of discretion." *Lin*, 771 F.3d at 182. Motions to reopen are "disfavored because every delay works to the advantage of the deportable alien who wishes merely to remain in the United States." *Sadhvani v. Holder*, 596 F.3d 180, 182 (4th Cir. 2009). For these reasons, a denial of a motion to reopen is "reviewed with extreme deference," *id.*, and will only be reversed if it was "arbitrary, irrational, or contrary to law." *Lin*, 771 F.3d at 182 (internal quotation marks omitted).

III.

A.

In his Second Motion, Petitioner argues that he was discriminatorily denationalized in 2011 when the officials at the Ethiopian embassy in Washington, D.C. refused to issue him a passport because of his Eritrean ethnicity. Furthermore, he argues that his denationalization constitutes changed circumstances arising in Ethiopia that allow him to file his otherwise untimely and number-barred motion to reopen pursuant to 8 C.F.R. § 1003.2(c)(3)(ii). Petitioner claims that he did not make this argument in his First Motion. But, regardless of whether Petitioner did or did not argue that his discriminatory denationalization constitutes changed circumstances in his First Motion,[6] it is clear that he *could* have, which is the operative question.

---

[6] We note, however, that if in denying Petitioner's First Motion, the BIA actually considered and rejected Petitioner's claim that his discriminatory denationalization constitutes changed circumstances arising in Ethiopia, the doctrine of collateral estoppel would bar Petitioner from relitigating that claim in his Second Motion. *See Ramsay v. I.N.S.*, 14 F.3d 206, 208 (4th Cir. 1994) (applying collateral estoppel to bar a challenge to

6

By the time Petitioner filed his First Motion in December 2011, the officials at the Ethiopian embassy had already refused to issue him a passport because of his Eritrean ethnicity, and Petitioner had already concluded that this refusal was an act of discriminatory denationalization. Indeed, Petitioner argued these points at length in his First Motion, as well as in his motion for reconsideration of the BIA's denial of that motion. *See* A.R. 200 (arguing in the First Motion that the Ethiopian government's rejection of his "passport application because of his Eritrean ethnicity" confirmed that the Ethiopian government "does not consider him its citizen"); A.R. 159–60 (arguing in his motion to reconsider that the BIA had "wholly ignored [his] claim that the Ethiopian government denationalized him as manifested by the denial of [his] passport in September 2011"). Moreover, establishing changed circumstances in Ethiopia must have -- or at least should have -- been on Petitioner's mind at the time of his First Motion. The BIA denied Petitioner's First Motion as untimely because he filed it over seven years after the BIA affirmed the IJ's denial of his original claims for relief -- well outside of the 90-day filing window set out in Section 1003.2(c)(2). However, pursuant to Section 1003.2(c)(3)(ii)'s

---

a deportation order). Whether the BIA previously addressed this argument is a close question. On the one hand, the BIA denied the First Motion -- which Petitioner labeled as a "motion to reopen sua sponte based on changed law *and changed circumstances*," A.R. 183 (emphasis supplied), and in which Petitioner unequivocally claimed that he was discriminatorily denationalized -- as untimely because Petitioner had "not shown changed circumstances or country conditions arising in [] Ethiopia." *Id.* at 172. On the other hand, Petitioner did not specifically argue that his denationalization was the "changed circumstances" to which the motion's label referred. Ultimately, we will take Petitioner at his word that he did not raise this argument in his First Motion. In any event, as explained herein, even if the Second Motion is free of any collateral estoppel problems, the BIA did not abuse its discretion in denying it.

7

exceptions to the 90-day filing rule, the First Motion would not have been untimely had Petitioner successfully argued that his discriminatory denationalization established changed circumstances. In other words, Petitioner had the necessary facts, as well as a strong incentive, to make the changed circumstances argument in his First Motion in 2011. Nonetheless, he waited until 2018 to raise it.

Petitioner contends that he waited until his Second Motion to argue that discriminatory denationalization constitutes changed circumstances arising in Ethiopia because he did not have enough evidence to support that claim until 2017, when the United Nations High Commissioner for Refugees formally recognized his statelessness. *See* Oral Argument at 18:54–19:26, *Ethiopis v. Barr*, No. 19-1237 (4th Cir. Sept. 10, 2020), https://www.ca4.uscourts.gov/oral-argument/listen-to-oral-arguments. This explanation is unpersuasive. Petitioner clearly believed that he had plenty of evidence of his statelessness at the time he filed his First Motion, in which he argued that he had been "stripped of his Ethiopian citizenship." A.R. 197. Moreover, the High Commissioner for Refugees' recognition of Petitioner's statelessness is irrelevant to the separate question of whether denationalization constitutes changed circumstances arising in Ethiopia for purposes of Section 1003.2(c)(3)(ii). That question is one that the court -- not the High Commissioner for Refugees -- must decide. *See Zambrano v. Sessions*, 878 F.3d 84, 87 (4th Cir. 2017) (holding in an asylum case that "the Court has jurisdiction to decide questions of law concerning the legal definition of a changed circumstance"). Even if the High Commissioner for Refugees' recognition of statelessness made us confident that Petitioner was in fact denationalized, it would not impact our analysis of whether that

8

denationalization constitutes a change in circumstances. Therefore, it does not make sense for Petitioner to have waited for that evidence before making his changed circumstances argument.

We are unable to identify any compelling reason as to why Petitioner waited until his Second Motion -- which he filed six and a half years after his First Motion and 13 and a half years after the BIA affirmed the IJ's denial of his claims for relief -- to argue that his discriminatory denationalization constitutes changed circumstances arising in Ethiopia. This unnecessary delay is problematic. Indeed, it is fatal to the petition before us.

B.

Petitioner's choice to make an argument in his Second Motion that "could have been raised [in his] first motion to reopen" runs afoul of "the policy discouraging piecemeal attacks on immigration orders." *Gottesman v. I.N.S.*, 33 F.3d 383, 389 (4th Cir. 1994). This policy preserves judicial and administrative resources and is conceptually related to the doctrine of res judicata, under which a party is barred "from relitigating a claim that was decided or *could have been* decided in an original suit." *Laurel Sand & Gravel, Inc. v. Wilson*, 519 F.3d 156, 161 (4th Cir. 2008) (emphasis supplied). It also promotes the "strong public interest in bringing [immigration] litigation to a close as promptly as is consistent with the interest in giving the adversaries a fair opportunity to develop and present their respective cases." *I.N.S. v. Abudu*, 485 U.S. 94, 107 (1988) (describing why motions to reopen are disfavored in removal proceedings). Finally, this policy reflects the fact that courts are uncomfortable with non-citizens filing "last minute challenges to underlying orders as a sure-fire way to prolong their stay in the United States." *Gottesman*,

9

33 F.3d at 389; *see also Lemus v. Gonzales*, 489 F.3d 399, 401 (1st Cir. 2007) ("Once removal has been mandated, an alien ought not be allowed to frustrate the removal order by filing an endless series of motions.").

Consistent with these principles, we and our sister circuits have disfavored subsequent motions to reopen that are based on arguments that could have been advanced in earlier motions to reopen. *See, e.g.*, *Gottesman*, 33 F.3d at 389 (denying petition for review of the BIA's "decision not to terminate [petitioner's] deportation proceedings while his second motion to reopen" was pending because the argument in second motion to reopen "could have been raised [with petitioner's] first motion to reopen"); *Jing v. Ashcroft*, 105 F. App'x 437, 440–41 (3d Cir. 2004) (noting that the "BIA was well within its discretion in denying the petitioners' second motion to reopen," which contained arguments that "could have been based in their first motion to reopen"); *Ajayi v. I.N.S.*, 62 F.3d 397, at *4 (5th Cir. 1995) (per curiam) (denying petition for review where arguments made in second motion to reopen "could have and should have been made" earlier).

Accordingly, we conclude it is not an abuse of discretion, but rather a sound exercise of judgment, for the BIA to deny a second motion to reopen where it is based on an argument that could have been raised in the first motion to reopen and where there is no compelling justification for the delay. Denying such a motion preserves judicial and administrative resources and increases the efficiency of immigration proceedings. Even more importantly, denying this type of motion does not deprive a petitioner of a fair opportunity to develop and present his case, because he would have had the chance to do so in his first motion to reopen. Here, because Petitioner's Second Motion falls squarely

10

within this category of disfavored motions, we conclude there was no abuse of discretion in the BIA's decision to deny it.

IV.

For the reasons set forth herein, the petition for review is

*DENIED*.